IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA,

JOSEPH CLARENCE MESSER,

    Petitioner,               No. CIV-S-03-0033 LKK KJM P

   vs.

DAVID L. RUNNELS, et al.,

    Respondents.          FINDINGS AND RECOMMENDATIONS

_____/

        Petitioner is a state prisoner proceeding pro se with an application for writ of habeas corpus under 28 U.S.C. § 2254. Petitioner was convicted in the Superior Court of El Dorado County of second degree murder. The jury also found that petitioner personally used, and intentionally discharged a firearm causing death. Petitioner was sentenced to a total of forty-years-to-life imprisonment in the California Department of Corrections: fifteen-years-to-life for second degree murder and twenty-five-years-to life for causing death by intentionally discharging a firearm.

I. Background

        Petitioner was convicted following a trial by jury. After sentencing, petitioner appealed his conviction and sentence to the California Court of Appeal. The Court of Appeal

/////

1

summarized the facts presented at trial as follows:

> After drinking a great deal of whiskey and beer, defendant shot his brother-in-law, David Michaud, in the chest with a 30.06 rifle at close range. He then dragged the body into his truck, dumped the body and rifle by a dirt road and, aided by others, he left the area. He shaved his face and cut his long hair. When he was captured a couple of months later, he told peace officers the killing was an accident.
>
> Defendant and his girlfriend, Tona Warmuth, lived in a trailer near a Georgetown house owned by defendant's sister, Patricia Michaud. She and her husband, the victim David Michaud, lived in the house, as did defendant's mother, Mary Johnson, defendant's son, Bobby, and defendant's grandson, Anthony. On November 3, 1998, David Michaud had permission from his probation officer to visit his wife, Patricia, who was in an Auburn hospital. He took this opportunity to go to Sacramento and invite his friend Mark Etter for a visit; after the men traded pain pills for methamphetamine and bought beer, they returned to David's house. David was on "house arrest." He was required to wear an electronic anklet.
>
> Tona testified she and defendant argued and she told him she was leaving. She then packed and left.
>
> Etter testified that when defendant saw him in the house defendant angrily asked what Etter was doing in "his" house. Etter told defendant why he was there and went into a bedroom with David to use drugs. David left the room to call his wife, Patricia, in the hospital. He went to Mary Johnson's bedroom to use the telephone and spoke to his wife; Mary overheard him tell Patricia that defendant was acting like a "jerk," and after the call David told Mary that if anything happened, she was to call 911. Patricia also testified that David said defendant was acting like a "jerk" and that he was going to "take care of it." David left Mary's bedroom and both she and Etter heard a gunshot. Etter left the bedroom and saw defendant pointing a gun at David, who was on the floor, "flopping" around. Defendant operated the bolt of the gun, then said "Game over." Defendant said if Etter did not want to die, he should leave. Etter left, and reported the shooting.
>
> When deputies arrived, they could not find a body, fresh blood or any bullet holes. A spent shell casing was found on the floor. Old bloodstains, from a prior shooting in the house, were found.
>
> A number of people helped defendant leave the Georgetown Divide after the shooting. Caron Moore, the girlfriend of defendant's son, Jesse, drove defendant to Riverside County. During the trip, defendant said he shot the victim for saying the "wrong words" while he, defendant, was very drunk. Defendant

said he used "soft shells," and that he had retrieved the gun from the trailer before the shooting.

On January 16, 1999, defendant was found at his son Jesse's house in Riverside County, and gave the police a false name. Defendant had been seen by peace officers there on a prior visit, but they had not recognized him, due to his significantly changed appearance.

Both in his statement to the peace officers and in his testimony at trial, defendant denied quarreling with the victim. He denied leaving the house to get the gun from his trailer (where his other guns were found after the shooting); he claimed he had taken this gun out to prepare to do some target shooting (even though it was getting dark and he was drunk) and he then put it in the house; after he took a shower and was preparing for dinner, he decided to move the gun to the trailer to keep it away from his grandson (the gun was presumably unattended while he was in the shower). He claimed he was holding the gun upright and leaned forward to allow the victim to pass him in a narrow hallway (less than four feet wide). However, instead of passing behind him, the victim struck at the gun barrel. As defendant fumbled to maintain control of the gun, it discharged. Defendant reflexively operated the bolt, ejecting the casing and reloading the chamber.

Defendant denied threatening Etter. He was scared, so he dragged David into his truck, and dumped him and the rifle near a dirt road. He claimed he did not want to traumatize his grandson by the sight of a corpse, mindful of how traumatized his granddaughter had been the last time someone had been shot in the home.

The parties stipulated that David's anklet left the house at 8:51 p.m., and this time accords with telephone records evidencing his telephone calls with Patricia in the Auburn hospital.

An autopsy revealed a great deal of blood in David's chest; because of the close range of the gunshot, blood was pushed back into the chest and the diaphragm sealed the wound, hence, remarkably, the lack of fresh bloodstains. David's blood alcohol level was .21 and he had methamphetamine in his system; however, decomposition of the body itself could have caused .07 or .08 of the alcohol level. The pathologist, who happened to be a big-game hunter, testified the bullet was soft-nosed, which caused it to expand on impact.

Both the gun and body were found covered with branches, near the Tiedman Mine. Defendant claimed the branches were there because of natural forces, he had not tried to cover the gun or the body.

Answer, Ex. D at 2-5. The Court of Appeal affirmed petitioner's conviction and sentence. Id.,

3

Ex. D at 30. Petitioner then sought review of the Court of Appeal's decision in the California Supreme Court. Id., Ex. E. Petitioner's request was denied without comment. Id, Ex. F. All of the claims presented in this action were presented to the Court of Appeal and the California Supreme Court on direct appeal.

II. Standards For Granting Habeas Relief

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). Federal habeas corpus relief also is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA). See Ramirez v. Castro, 365 F.3d 755, 773-75 (9th Cir. 2004) (Ninth Circuit affirmed lower court's grant of habeas relief under 28 U.S.C. § 2254 after determining that petitioner was in custody in violation of his Eighth Amendment rights and that § 2254(d) does not preclude relief); see also Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003) (Supreme Court found relief precluded under § 2254(d) and therefore did not address the merits of petitioner's Eighth Amendment claim).[1] Courts are not required to address the merits of a particular claim, but may simply deny a habeas application on the ground

---

[1] In Bell v. Jarvis, 236 F.3d 149, 162 (4th Cir. 2000), the Fourth Circuit Court of Appeals held in a § 2254 action that "any independent opinions we offer on the merits of constitutional claims will have no determinative effect in the case before us . . . At best, it is constitutional dicta." However, to the extent Bell stands for the proposition that a § 2254 petitioner may obtain relief simply by showing that § 2254(d) does not preclude his claim, this court disagrees. Title 28 U.S.C. § 2254(a) still requires that a habeas petitioner show that he is in custody in violation of the Constitution before he or she may obtain habeas relief. See Lockyer, 538 U.S. at 70-71; Ramirez, 365 F.3d at 773-75.

that relief is precluded by 28 U.S.C. § 2254(d).  Lockyer, 538 U.S. at 71 (overruling Van Tran v. Lindsey, 212 F.3d 1143, 1154-55 (9th Cir. 2000) in which the Ninth Circuit required district courts to review state court decisions for error before determining whether relief is precluded by § 2254(d)).  It is the habeas petitioner's burden to show he is not precluded from obtaining relief by § 2254(d).  See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different.  As the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply fails to cite or fails to indicate an awareness of federal law.  Early v. Packer, 537 U.S. 3, 8 (2002).

The court will look to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S. 919 (2003).  Where the state court fails to give any reasoning whatsoever in support of the denial of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court must perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable.  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  In other

5

1 words, the court assumes the state court applied the correct law, and analyzes whether the
2 decision of the state court was based on an objectively unreasonable application of that law.
3       It is appropriate to look to lower federal court decisions to determine what law has
4 been "clearly established" by the Supreme Court and the reasonableness of a particular
5 application of that law.  See Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999).
6 III.  Arguments and Analysis
7       A.  Jury Instructions (Claims 1 and 2)
8       Petitioner raises four challenges to the manner in which jurors were instructed to
9 deliberate.  Federal habeas courts do not grant relief, as might a state appellate court, simply
10 because a jury instruction may have been deficient.  The only question for the federal court is
11 whether the allegedly ailing instruction by itself so infected the entire trial that the resulting
12 conviction violates due process.  Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).  A
13 violation of due process occurs if a trial is fundamentally unfair.  Estelle v. McGuire, 502 U.S.
14 62, 72-73 (1991).
15       1.  Voluntary Manslaughter
16       Petitioner claims that jurors were improperly instructed that in order for them to
17 find petitioner guilty of involuntary manslaughter, they had to find, among other things, that
18 petitioner intended to kill David Michaud.  Attach. to Pet. at 2-6.  The California Court of Appeal
19 agreed that jurors were instructed incorrectly with respect to voluntary manslaughter.

> The jury was told murder requires malice, which could be express
> or implied: Express malice was "when there is manifested an
> intention unlawfully to kill a human being."  Implied malice was
> when the killing "resulted from an intentional act," the "natural
> consequences" of which "are dangerous to human life," and the act
> was done deliberately, "with knowledge of the danger to, and with
> conscious disregard for," human life.
>
> The trial court gave the then-standard voluntary manslaughter
> instruction (CALJIC No. 8.40): "Every person who unlawfully
> kills another human being without malice aforethought *but with an
> intent to kill*, is guilty of voluntary manslaughter in violation of
> Penal Code Section 192(a). [¶] There is no malice aforethought if

> the killing occurred upon a sudden quarrel or heat of passion. [¶] In order to prove this crime, each of the following elements must be proved: [¶] One, a human being was killed. [¶] Two, the killing was unlawful. [¶] *And three, the killing was done with the intent to kill.* [¶] A killing is unlawful if it was neither justifiable nor excusable." The court instructed on the concurrence of act and intent (CALJIC No. 3.31), that murder and voluntary manslaughter "require the specific intent to kill."
>
> After the trial was over, the California Supreme Court held intent to kill is not an element of voluntary manslaughter. (*People v. Lasko* (2000) 23 Cal.4th 101 (Lasko).) Manslaughter is the unlawful killing of a human being without malice. (Pen. Code, § 192.) "A defendant lacks malice and is guilty of voluntary manslaughter in 'limited, explicitly defined circumstances: either when the defendant acts in a "sudden quarrel or heat of passion" (§ 192, subd. (a)), or when the defendant kills in "unreasonable self-defense[.]"'" (*Lasko*, *supra*, 23 Cal.4th at p.108.) It is also voluntary manslaughter "when a person, acting with a conscious disregard for life *unintentionally* kills a human being, but the killing occurs during a sudden quarrel or in the heat of passion[.]" (*Id*. at p. 108; see *People v. Doyell* (1874) 48 Cal. 85, 96 ["the law, in some cases of voluntary manslaughter, disregards the actual intent to kill, when the killing is . . . caused by sufficient provocation."].) Therefore, intent to kill is not a necessary element of voluntary manslaughter, although most voluntary manslaughters *do* include an intent to kill.

Answer, Ex. D at 7-8 (emphases in original).

It follows from the reasoning of the appellate court that petitioner was deprived of having jurors instructed that they could find petitioner guilty of the lesser included offense of voluntary manslaughter occurring without intent to kill. This court must determine if petitioner's due process rights were violated by the trial court's failure to give this instruction. Because the Court of Appeal declined to reach the due process aspect of petitioner's claim, id., Ex. D at 9,[2] this court assumes the California Supreme Court's rejection of petitioner's claim is based on an application of the correct law, and analyzes whether the decision of that court reflects an objectively unreasonable application of that law.

/////

---

[2] The state appellate court did note generally that a finding of any federal constitutional error was precluded by Estelle and Lasko.

7

The failure of a trial court to instruct on a lesser included offense in a non-capital case does not present a federal constitutional question. Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998). However, the defendant's right to adequate jury instructions on his or her theory of the case might, in some cases, constitute an exception to this general rule. Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir. 1984). In this case, petitioner's right to present a defense was not compromised by the court's failing to instruct jurors correctly with respect to voluntary manslaughter because petitioner's only defense to the killing of David Michaud was accident. RT 600:26-610:27, 718-738; see Bashor, 730 F.2d at 1240. Morever, at the instruction conference, counsel for petitioner objected to jurors being instructed with respect to anything other than first degree murder. RT 541. Accordingly, the California Supreme Court's rejection of petitioner's claim regarding the manner in which jurors were instructed concerning voluntary manslaughter was not based upon an objectively unreasonable application of federal law.

### 2. Involuntary Manslaughter

Next, petitioner claims his right to due process was violated by the trial court's failure to instruct jurors that they could find petitioner guilty of involuntary manslaughter.[3] Attach. to Pet. at 6-7. The California Court of Appeal addressed whether state law required that jurors be instructed as to involuntary manslaughter, but did not independently address petitioner's due process claim. Answer, Ex. D at 15-20. Therefore, the court again assumes the California Supreme Court applied the correct law when rejecting petitioner's claim and analyzes

---

[3] California Penal Code § 192 reads, in pertinent part:

> Manslaughter is the unlawful killing of a human being without malice. It is of three kinds:
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> (b) Involuntary–in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection. . .

whether the decision of the California Supreme Court reflects an objectively unreasonable application of that law. As with petitioner's voluntary manslaughter claim, petitioner's involuntary manslaughter claim fails because petitioner generally does not have a federal right to have jurors instructed as to a lesser included offense. Windham, 163 F.3d at 1106. Furthermore, petitioner's right to present a defense was not infringed by the trial court's failure to read the involuntary manslaughter instruction to the jury because petitioner's defense to the killing of David Michaud was accident. For these reasons, the California Supreme Court's rejection of petitioner's claim that jurors should have been instructed that they could find petitioner guilty of involuntary manslaughter does not reflect an unreasonable application of federal law.

### 3. Voluntary Intoxication

Petitioner claims he was denied due process by the trial court's denial of the prosecution's request that jurors be instructed they could consider petitioner's intoxication in evaluating what exactly petitioner intended, if anything, when he fired the shot that killed David Michaud.[4] Attach. to Pet. at 7-9. Again, the California Court of Appeal did not address the due process aspect of this claim.

As noted by the Court of Appeal, evidence was presented indicating petitioner drank significantly before shooting David Michaud, RT 600:11-22, but there was no evidence indicating that petitioner's actions were unintentional or involuntary due to intoxication. Answer, Ex. D at 21-22. When petitioner was asked whether his drinking had any effect on his memory of the events of the night David Michaud was shot, petitioner responded "no, not . . . not memory." RT 600:23-27. During his testimony, petitioner recalled, in very specific detail, the events of that evening including the events leading up to the shooting, the shooting itself and the events occurring after the shooting including petitioner's hiding David Michaud's body; his

---

[4] The proffered instructions on voluntary intoxication are located at pages 158-162 of the "Clerk's Transcript." It does not appear that a court reporter was present when the discussion concerning whether these instructions would be given to the jury was held. Cf. RT 538-543.

9

testimony overall is consistent with his theory that the shooting was accidental in nature. RT 588:10-616:20. In the context of this record, the California Supreme Court's denial of petitioner's claim regarding voluntary intoxication instructions does not reflect an unreasonable application of federal law. Petitioner was not denied a fair trial by the failure of the trial court to give the instructions because there simply was no evidence that petitioner's being intoxicated negated any intent petitioner might have had with respect to the shooting of David Michaud.

4. <u>Instruction Regarding Firearm Enhancement</u>

As noted above, petitioner was sentenced to twenty-five-years-to-life imprisonment under California Penal Code § 12022.53(d), for causing death by intentionally discharging a firearm. Petitioner claims this sentence cannot stand because jurors were not told they had to find that petitioner intentionally discharged a firearm in order to find the enhancement applicable. Attach. to Pet. at 9-11. The instruction given to jurors reads as follows:

> It is alleged that the defendant personally used a firearm during the commission of the crimes charged.
>
> If you find the defendant guilty of the crime charged or a lesser offense, you must determine whether the defendant personally used a firearm in the commission of that felony.
>
> The word "firearm" includes a rifle.
>
> The term "personally used a firearm," as used in this instruction, means that the defendant must have intentionally displayed a firearm in a menacing manner, intentionally fired it, or intentionally struck or hit a human being with it.
>
> The People have the burden of proving the truth of this allegation. If you have reasonable doubt that it is true, you must find it to be not true.
>
> Include a special finding on that question in your verdict, using a form that will be supplied for that purpose.

CT 223. Petitioner claims there was no evidence that he committed second degree murder while intentionally displaying a firearm in a menacing manner or by intentionally striking a human being with a firearm. Therefore, petitioner asserts jurors could have found the above

enhancement applicable without proper factual support. The California Court of Appeal issued a short reasoned opinion with respect to petitioner's claim, noting that the trial court apparently failed to edit the instruction to delete references to brandishment or striking with the firearm, but that no prejudice resulted based on the record as a whole. Answer, Ex. D at 24-26.

Petitioner has not shown that the California Court of Appeal's adjudication of his claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Rather, in Griffin v. United States, 502 U.S. 46, 51-60 (1991), the Supreme Court held there is no Constitutional basis to set aside a general verdict because one of the possible bases of conviction is unsupported by sufficient evidence. In light of Griffin, petitioner's claim should be rejected.

B. Evidence Concerning Character Of The Victim

Petitioner claims he was denied due process when the trial court refused to allow petitioner to present certain evidence regarding David Michaud's character. Attach. to Pet. at 11-13. The California Court of Appeal did not address the issue as a due process claim. Answer, Ex. D at 23-24.

Petitioner asserts that evidence indicating Michaud was argumentative and had a propensity for violence would have bolstered petitioner's assertion at trial that Michaud struck petitioner's 30.06 and caused petitioner to pull the trigger. Alternatively, petitioner claims such evidence would have provided more evidence that petitioner committed voluntary manslaughter instead of second degree murder. Cf. CT 203, 206 (instructions).

State court evidentiary rulings cannot serve as a basis for habeas corpus relief unless federal constitutional rights are affected. Tinsley v. Borg, 895 F.2d 520, 530 (9th Cir. 1990). A violation of the Due Process Clause of the Fourteenth Amendment occurs if a state court evidentiary ruling rendered a trial arbitrary and fundamentally unfair. Jammal v. Van de

Kamp, 926 F.2d 918, 920 (9th Cir. 1991).  A fair trial includes the opportunity to present a complete defense.  Crane v. Kentucky, 476 U.S. 683, 690 (1986).  But, having the opportunity to present a complete defense does not provide a criminal defendant with license to say or present anything he pleases.  Courts will not find that a due process violation has occurred based on the exclusion of evidence proffered by the defense if the excluded evidence was, among other things, marginally relevant or repetitive.  See id. at 689-90.

Evidence regarding David Michaud's general character or reputation for violence was not relevant to petitioner's defense.  There is no evidence suggesting, nor does petitioner argue, that petitioner shot Michaud in self-defense or because he was afraid.  Petitioner's assertion that Michaud's history of violent behavior and the fact that he was argumentative made it more likely that Michaud would strike out at petitioner's 30.06 as petitioner carried it down a hallway is pure speculation.  Attach. to Pet. at 11.  Petitioner fails to point to anything indicating Michaud had any reason to be violent toward petitioner as they met in the hallway, or that Michaud's pushing the gun was an act of violence.

Even if jurors had learned about Michaud's propensity for violence or the degree to which he was argumentative, it is unlikely petitioner's trial would have had a different result.  It is possible jurors surmised that some sort of argument occurred between petitioner and Michaud before Michaud was shot.  Among other evidence supporting this theory is the fact that petitioner told Caron Moore that petitioner shot Michaud after Michaud "said the wrong words."  RT 358:3-361:20.  But there was no evidence indicating the argument rose to the level necessary to provide a basis for a finding of voluntary manslaughter rather than second degree murder.  See CT 207.  Therefore, exclusion of the evidence regarding Michaud's character did not deny petitioner a fair trial.  See James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994) (conclusory allegations which are not supported by statement of specific facts do not warrant habeas relief).

For these reasons, the California Supreme Court's rejection of petitioner's claim regarding the exclusion of evidence concerning the character of David Michaud does not reflect

an objectively unreasonable application of federal law.  Petitioner's claim should be denied.

      C. <u>Sentence For Firearm Enhancement</u>

    Petitioner claims that his sentence of twenty-five-years-to-life imprisonment for using and intentionally discharging a firearm causing death constitutes cruel and unusual punishment prohibited by the United States and California Constitutions.  Attach. to Pet. at 13-15.

    Cruel and unusual punishment is prohibited by the Eighth Amendment.  In <u>Lockyer</u>, the Supreme Court identified what constitutes clearly established law with respect to petitioner's Eighth Amendment claim at time the claim was before California's courts:  a sentence for a term of years to state prison cannot be "grossly disproportionate" to the offense.  <u>Lockyer</u>, 538 U.S. at 72.  The precise contours of the gross disproportionality principle are unclear and "applicable only in the exceedingly rare and extreme case."  <u>Id</u>. at 73 (internal quotation marks omitted).

    After identifying this "grossly disproportionate" principal, the California Court of Appeal rejected petitioner's Eighth Amendment claim because petitioner "fail[ed] to develop any argument that his punishment is disproportionate to similar conduct, either in California or other states."  Answer, Ex. D at 30.

    Petitioner has not met his burden of showing that the adjudication of his Eighth Amendment claim by the state Court of Appeal resulted in a decision that was contrary to clearly established federal law, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented to the state court.  The Court of Appeal properly identified the "grossly disproportionate" framework applicable to Eighth Amendment claims concerning the length of a term of imprisonment.  Petitioner fails to present anything suggesting the application of this framework to his sentence was directly contrary to the application of the framework in any federal case law or simply unreasonable, as he fails to present any federal precedent suggesting that a sentence for any term of years of imprisonment for using and intentionally discharging a firearm causing death is grossly disproportionate.  Petitioner's claim

1  concerning his sentence must be denied.

2  Petitioner's claim that his sentence violates California's Constitution is not
3  cognizable in this action, as federal habeas relief is only available for violations of the United
4  States Constitution or laws of the United States. 28 U.S.C. § 2254(a).

5  IV. Conclusion

6  For all of the foregoing reasons, the court will recommend that petitioner's
7  application for writ of habeas corpus be denied.

8  Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a
9  writ of habeas corpus be denied.

10  These findings and recommendations are submitted to the United States District
11  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fifteen
12  days after being served with these findings and recommendations, any party may file written
13  objections with the court and serve a copy on all parties. Such a document should be captioned
14  "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections
15  shall be served and filed within five days after service of the objections. The parties are advised
16  that failure to file objections within the specified time may waive the right to appeal the District
17  Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

18  DATED: March 15, 2006.

_____
UNITED STATES MAGISTRATE JUDGE

1
mess0033.157